**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD C. CONRAD,
        *Plaintiff-Appellant,*

v.

ACE PROPERTY & CASUALTY
INSURANCE COMPANY, a
Pennsylvania corporation;
RAIN AND HAIL LLC, an Iowa
limited liability corporation,
        *Defendants-Appellees.*

No. 06-35539

D.C. No.
CV 05-5117 FVS

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Fred L. Van Sickle, District Judge, Presiding

Argued and Submitted
January 8, 2008—Seattle, Washington

Filed July 14, 2008

Before: Andrew J. Kleinfeld, A. Wallace Tashima, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tashima

## COUNSEL

Nicholas P. Gellert, Perkins Coie, Seattle, Washington, for the plaintiff-appellant.

Sean P. Boutz, Evans, Craven & Lackie, Spokane, Washington, for the defendants-appellees.

## OPINION

TASHIMA, Circuit Judge:

We consider whether the standard Adjusted Gross Revenue Insurance Policy, a policy which provides crop revenue insurance pursuant to the Federal Crop Insurance Act, incorporates and mandates the claim adjustment procedures set forth in the Federal Crop Insurance Corporation's Adjusted Gross Revenue Standards Handbook. We hold that it does.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1332(a) based on the complete diversity of citizenship between defendants, Ace Property & Casualty Insurance Co., a Pennsylvania corporation, and Rain & Hail, LLC, an Iowa limited liability corporation, both of whose principal places of business are outside of the State of Washington, and Richard Conrad, a citizen of Washington.[1] We have jurisdiction on appeal from the final judgment under 28 U.S.C. § 1291.

## BACKGROUND

Enacted in 1938, the Federal Crop Insurance Act ("Act" or "FCIA"), 7 U.S.C. § 1501 *et seq.,* is designed to "promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance," *id.* § 1502(a). To administer the Act, Congress created the Federal Crop Insurance Corporation ("FCIC"), a government-owned corporation which acts as an "agency of and within the Department" of Agriculture ("USDA"). *Id.* § 1503; *see also Fed. Crop Ins.*

---

[1]Because the district court had subject matter jurisdiction under § 1332, we need not inquire whether it also had federal question jurisdiction under 28 U.S.C. § 1331.

*Corp. v. Merrill*, 332 U.S. 380, 381 (1947). The FCIC is, in turn, regulated by the USDA's Risk Management Agency ("RMA"). *See Barnhill v. Veneman (In re Peanut Crop Ins. Litig.)*, 524 F.3d 458, 462 (4th Cir. 2008); *Tex. Peanut Farmers v. United States*, 409 F.3d 1370, 1372 (Fed. Cir. 2005); 7 C.F.R. § 400.701. The RMA's function is to supervise the FCIC and administer all programs authorized under the FCIA. 7 U.S.C. § 6933(a), (b)(1)-(3); *Acceptance Ins. Cos. Inc. v. United States*, 503 F.3d 1328, 1330 (Fed. Cir. 2007). The FCIA empowers the FCIC to provide crop insurance directly to farmers or provide reinsurance to private insurance providers who then provide crop insurance to farmers. *See* 7 U.S.C. § 1508(a)(1); *Alliance Ins. Co. v. Wilson*, 384 F.3d 547, 549-50 (8th Cir. 2004). Indeed, Congress has directed the FCIC to provide reinsurance to insurers "to the maximum extent practicable." 7 U.S.C. § 1508(k).

One of the types of federal crop insurance is adjusted gross revenue ("AGR") insurance, which "insures the revenue of the entire farm, not just the revenue derived from individual crops, by guaranteeing a percentage of the farm's average gross revenue." Christopher R. Kelley, *The Agricultural Risk Protection Act of 2000: Federal Crop Insurance, the Non-insured Crop Disaster Assistance Program, and the Domestic Commodity and Other Farm Programs*, 6 Drake J. Agric. L. 141, 144 (2001); *see also* 7 U.S.C. § 1523(e). *See generally* U.S. Gen. Accounting Office, GAO-04-517, Crop Insurance: USDA Needs to Improve Oversight of Insurance Companies and Develop a Policy to Address Any Future Insolvencies 7 (2004) ("Revenue insurance, a newer crop insurance product, provides protection against losses in revenue associated with low crop market prices in addition to protecting against crop loss."). Under the AGR pilot program, AGR insurance is offered through reinsurance arrangements with private insurances companies, which in turn provide AGR insurance to farmers. *See* 7 U.S.C. § 1523(e). RMA has jurisdiction over pilot programs involving revenue insurance. 7 U.S.C. § 6933(b)(3).

Richard C. Conrad owns and operates a fruit orchard in Franklin County, Washington. In order to protect his future revenue, Conrad purchased an AGR Policy ("Policy") from Ace Property & Casualty Insurance Company ("Ace"). Rain & Hail, LLC (hereinafter referred to together with Ace as "Rain & Hail") acted as Ace's agent for the issuance and service of the policy. The Policy, a form policy issued by the USDA,[2] makes plain that it was issued pursuant to the FCIC's reinsurance program and that the Policy should be read in light of the federal crop insurance program. The Policy provides:

> This insurance policy is reinsured by the Federal Crop Insurance Corporation (FCIC) under the provisions of the Federal Crop Insurance Act (7 U.S.C. 1501 *et seq.*) (Act). All provisions of the policy and rights and responsibilities of the parties are specifically subject to the Act. The provisions of the policy may not be waived or varied in any way by the crop insurance agent or any other agent or employee of FCIC or the company. In the event we cannot pay your loss, your claim will be settled in accordance with the provisions of this policy and paid by FCIC.

The Policy also defines "Policy" as "[t]he agreement between [the farmer] and [the insurance company] consisting of the accepted application, these provisions, Special Provisions, actuarial documents, and the applicable regulations published in 7 C.F.R. chapter IV." Policy § 1.

The Policy, while perpetual in duration, provides different coverage amounts in different years. In other words, the reve-

---

[2]The form policy is available on the RMA's website at http://rma.usda.gov/ftp/policies/2001/agr/pdf/2001-AGR.pdf. The form policy is posted on the website along with the Adjusted Gross Revenue Standards Handbook. *See* Risk Mgmt. Agency, U.S. Dep't of Agric., Adjusted Gross Revenue (AGR), http://www.rma.usda.gov/Policies/agr.html#2004.

nue protection in one year could be higher or lower than the year before. The key to the amount of coverage provided in a given year is what is called the "Approved AGR." From this, the amount of coverage and, in turn, the annual premiums are determined. *See* Policy § 6. The Approved AGR also serves as the base number from which the amount of indemnity owed is determined in the event of a loss. *See* Policy § 11. The central dispute in this case concerns how the Approved AGR should have been determined for Conrad's AGR Policy.

Because younger trees planted to replace damaged trees and out-of-date varietals would be reaching maturity in 2004, Conrad anticipated that his orchard would produce significantly higher revenue in 2004 than it had in previous years. Indeed, Conrad expected total revenue from 2004 to reach $2,341,360, whereas his orchard's revenue over the previous five years had ranged from $1,474,377 to $1,836,600, averaging $1,620,644 per year. Anticipating this growth, Conrad requested higher AGR coverage—up to $2,341,360—in order to reflect the expected increase in revenue. Conrad argued that the definition of Approved AGR in the Policy demands that an adjustment must reflect any expected increase in allowable income. The Policy defines "Approved AGR" as:

> The simple average of the AGR income history you[3] included on your farm report, adjusted to reflect any expected increase or reduction in allowable income for the insurance year (see section 5).

Policy § 1. To Conrad, this means that the Approved AGR should be adjusted to match exactly his expected revenue.

Rain & Hail informed Conrad that he could obtain cover-

---

[3]"Throughout this policy, 'you' and 'your' refer to the named insured shown on the accepted application and 'we,' 'us,' and 'our' refer to the insurance company providing insurance." Policy at 1.

age based only on an Approved AGR of $1,640,092. Rain & Hail told Conrad that this lower figure was based on the indexing provisions of the 2004 Adjusted Gross Revenue Standards Handbook ("Handbook"), which is published by the FCIC. *See* FCIC, USDA, Adjusted Gross Revenue Standards Handbook § 19, at 44-49 (Dec. 2003) (providing formulas to calculate the Approved AGR), *available at* http://www.rma.usda.gov/ftp/publications/directives/18000/pdf/04_18050.pdf.

Conrad's position was and is that the Policy itself contains a definition of Approved AGR different from the Handbook, a definition much more favorable to Conrad, and that the Handbook should not be consulted to determine the Approved AGR. On the other hand, Rain & Hail's position was and is that the definition of Approved AGR found in the Policy— "[t]he simple average of the AGR income history you included on your farm report, adjusted to reflect any expected increase or reduction in allowable income for the insurance year (see section 5)"—should be read in conjunction with § 10 of the Policy which states, that "[w]e recognize and apply the claim adjustment and other procedures established or approved by FCIC," and in light of the crop reinsurance program and the relevant regulations. In other words, Rain & Hail contends that the Policy provides that an Approved AGR may be set higher than the five-year average when the insured proves that revenue will be higher than the average, but that it will be set pursuant to the "procedures established or approved by FCIC," specifically, by using the formulas found in the Handbook.

Despite Conrad's heightened expectations for 2004, harsh weather conditions caused a lower than expected yield, resulting in much lower than anticipated revenue.[4] After suffering the loss, Conrad submitted a claim for $1,021,591, which was calculated based on an Approved AGR of $2,341,360, *i.e.*, his

---

[4]Rain & Hail does not dispute that Conrad suffered a 2004 crop loss.

entire expected revenue, and factored in the higher premium that he would have had to pay for that level of coverage (the additional premium would be $18,904). Rain & Hail repeated its earlier position that the Approved AGR was determined by referring to the procedures in the Handbook, which limited the coverage to $516,686. Conrad accepted the lower payment under protest, reserving his right to seek additional amounts based on his theory of the Policy.

Conrad filed an action for contract damages in Washington state superior court, which Rain & Hail timely removed to the federal district court. Because the case presented a pure issue of law, *i.e.*, the proper interpretation of the Policy, the parties filed cross-motions for summary judgment. The district court granted defendants' cross-motion for summary judgment, reasoning that the Policy is not ambiguous:

> Although Section 10 of the Policy does not specifically identify which claim adjustment procedures may be applied, Section 10 does state that the insurer will recognize and apply those claim adjustment procedures "established or approved by FCIC." Here, Plaintiff does not dispute that the Handbook was established and approved by the FCIC. Although Plaintiff argues Section 10 is only applicable to loss claims, and not the determination of an insured's Approved AGR, Plaintiff acknowledges that the Approved AGR is crucial in determining each and every loss claim. Thus, when the Court reads the Policy as a "whole", Section 10 is certainly applicable to determining the Approved AGR when calculating a claim for loss or damage.

*Conrad v. Ace Prop. & Cas. Ins. Co.*, No. CV 05-5117 FVS, 2006 WL 1582376, at *4 (E.D. Wash. June 5, 2006). Conrad timely appealed.

## STANDARD OF REVIEW

The district court's grant of summary judgment on a contract claim is reviewed *de novo*, *see S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors*, 359 F.3d 1127, 1130 (9th Cir. 2004), as is its interpretation and meaning of contract provisions, *see United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1264 (9th Cir. 2003).

## ANALYSIS

[1] Because federal jurisdiction in this case is based on diversity of citizenship, we apply the substantive law of the state of Washington. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Moreover, in construing FCIA contracts,[5] state law applies except when the contract provides that state law does not apply or when state law conflicts with the contract provisions or FCIC regulations. *See* 7 U.S.C. § 1506(*l*); *Kroeplin Farms Gen. P'ship v. Heartland Crop Ins., Inc.*, 430 F.3d 906, 910 (8th Cir. 2005). Neither exception applies in this case.

Under Washington law, the rules for interpreting an insurance contract are well-settled. *See Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005). Interpretation of an insurance contract is a question of law and the "policy is construed as a whole with the court giving force and effect to each clause in the policy." *Am. Star Ins. Co. v. Grice*, 854 P.2d 622, 625 (Wash. 1993). The court should "give it a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Quadrant Corp.*, 110 P.3d at 737 (internal quotation marks

---

[5]As noted, the Policy specifically provides that "[t]his insurance policy is reinsured by the Federal Crop Insurance Corporation (FCIC) under the provisions of the Federal Crop Insurance Act . . . . All provisions of the policy and rights and responsibilities of the parties are specifically subject to the Act."

omitted). If the language is clear and unambiguous, the court will enforce the contract as written and may not create ambiguity where none exists. *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.*, 951 P.2d 250, 256 (Wash. 1998).

If, on the other hand, the clause is ambiguous, meaning that "on its face, it is fairly susceptible to two different interpretations, both of which are reasonable," the court may rely upon extrinsic evidence of the intent of the parties to resolve the ambiguity. *Id.* Ambiguities which remain after a consideration of extrinsic evidence are resolved against the insurer-drafter and in favor of the insured. *Quadrant Corp.*, 110 P.3d at 737. But, while ambiguities should be construed against the drafter, "a strict application should not trump the plain, clear language . . . such that a strained or forced construction results." *Id.* "Finally, in Washington[,] the expectations of the insured cannot override the plain language of the contract." *Id.*

Conrad contends that the Policy demands that the Approved AGR reflect the entire expected increase:

> Conrad should have been allowed to obtain coverage adjusted to his actual expected revenue for the 2004 crop year. That is what the AGR Policy promised by stating that Approved AGR would be "adjusted to reflect any expected increase or reduction in allowable income."

Appellant's Brief at 13; *see also id.* at 15 ("The AGR Policy clearly and unambiguously requires that the Approved AGR be established to reflect **all** increases or decreases from the five-year average."

**[2]** Conrad's theory of the contract fails because the definition of Approved AGR and the provisions of the Policy do not support his reading. The definition of Approved AGR provides, in its entirety:

> The simple average of the AGR income history you included on your farm report, adjusted to reflect any expected increase or reduction in allowable income for the insurance year (see section 5).

Policy § 1. The relevant provision in § 5 of the Policy states that if the farmer "can prove that your allowable income for the insurance year will be higher than the average of your AGR income history, [the insurance company] may establish [the farmer's] approved AGR at a greater amount than the average." Policy § 5(e)(3). Those two provisions when read together establish that the insurance company "may" establish an AGR above the income history average, but fail to articulate exactly how the average is to be established or adjusted. Nothing in §§ 1 and 5 suggests that the Approved AGR will constitute the entire expected increase.

Indeed, under the least charitable reading to Conrad, we would conclude only that the insurance company "may" adjust the average. That is, any adjustments are optional and done at the insurer's discretion. *See, e.g.*, *City of Imperial Beach v. Escott*, 171 Cal. Rptr. 197, 200 (Ct. App. 1981) (finding the use of "may" in an ordinance to be permissive and not mandatory). Nevertheless, even if we assume that "may" means "must," *see, e.g.*, Black's Law Dictionary 1000 (8th ed. 2004) ("[M]ay, . . . 3. Loosely, is required to; shall; must . . . . In dozens of cases, courts have held *may* to be synonymous with *shall* or *must*, usu. in an effort to effectuate legislative intent."), we are left only with the conclusion that the definitions of Approved AGR in §§ 1 and 5 provide that the Approved AGR must be adjusted upward when the insured demonstrates that revenue will be greater than the five-year average, but that those sections are silent as to how the adjustment to the Approved AGR is calculated. From this, Conrad would have us conclude that the contract is ambiguous, and as such, he argues, we should resolve the ambiguity against Rain & Hail and in favor of Conrad. *See Quadrant Corp.*, 110 P.3d at 737.

**[3]** The district court and Rain & Hail offer a better reading of the Policy. Rain & Hail accepts that it was obligated to adjust the Approved AGR upward; it argues, however, that the Approved AGR should be adjusted by using the indexing formulas derived from the Handbook. Rain & Hail argues that the policy is not silent as to how the Approved AGR is determined. Instead, it argues that the duties set forth under § 10 of the Policy, which mandates that Rain & Hail "recognize and apply the claim adjustment and other procedures established or approved by FCIC," include the use of the Handbook's claim handling procedures. Rain & Hail argues that when the "[P]olicy is construed as a whole with the court giving force and effect to each clause in the policy," *Am. Star Ins.*, 854 P.2d at 625, we should give effect to § 1's definition of Approved AGR, the language in § 5(e), *and* the language in § 10(b)(3). Section 10(b)(3) provides:

> (b)   Our DUTIES —
>
> . . .
>
> > (3) We recognize and apply the claim adjustment and other procedures established or approved by FCIC.

Conrad does not dispute that the Handbook provides "claim adjustment and other procedures established or approved by FCIC"; instead, he argues that § 10(b)(3) acts only as a limitation on the insurer in its relationship with the FCIC. Conrad's position, however, is untenable because § 10(b) pertains to Rain & Hail's duties with respect to how and when Conrad would be paid for a loss. None of the provisions of § 10(b) discusses Rain & Hail's relationship to the FCIC outside of that context.[6]

---

[6]Section 10(b) of the Policy provides, in its entirety:

  (b)   Our DUTIES —

**[4]** Moreover, the limitations by which the insurer must abide are specifically incorporated into the Policy's definition of "Policy." That is, the Policy itself incorporates the regulations published in 7 C.F.R. ch. IV, by defining "Policy" as "[t]he agreement between you and us consisting of the accepted application, these provisions, Special Provisions, actuarial documents, and the applicable regulations published in 7 C.F.R. chapter IV." And, 7 C.F.R. § 400.168(d) specifically requires reinsurance companies to "utilize only loss adjustment procedures and methods that are approved by the [FCIC]." The Handbook contains the loss adjustment procedures and methods approved by the FCIC. Indeed, the Handbook explicitly states, in bold type:

**HANDBOOK FCIC-18050 (12-2003) CONTAINS THE OFFICIAL FCIC-APPROVED UNDERWRITING, ADMINISTRATION, AND LOSS ADJUSTMENT STANDARDS FOR AGR FOR 2004 AND SUCCEEDING INSURANCE YEARS. IN THE ABSENCE OF INDUSTRY-DEVELOPED, FCIC-APPROVED PROCEDURE FOR AGR FOR 2004 AND SUCCEEDING INSURANCE YEARS, ALL REINSURED COMPANIES WILL UTILIZE THESE STAN-**

---

(1)   If you have complied with all the policy provisions, we will pay your loss within 30 days after:

(i)     We reach agreement with you;

(ii)    Completion of arbitration or appeal proceedings; or

(iii)   The entry of a final judgment by a court of competent jurisdiction.

(2)   In no event can a claim be settled until farm tax forms for the insurance year are filed with the IRS (see section 11(d)).

(3)   We recognize and apply the claim adjustment and other procedures established or approved by FCIC.

**DARDS FOR UNDERWRITING, LOSS ADJUSTMENT, AND FOR LOSS TRAINING.**

Handbook at SC 1. Thus, the definition of "Policy," by incorporating the parties' obligation to "utilize only loss adjustment procedures and methods that are approved by the [FCIC]," requires that the Handbook be used to determine the Approved AGR.

[5] The Policy's language which provides that the reinsurance company will "recognize and apply the claim adjustment and other procedures established or approved by FCIC," *see* Policy § 10, coupled with the regulations requiring reinsurance companies to "utilize only loss adjustment procedures and methods that are approved by the [FCIC]," 7 C.F.R. § 400.168(d), makes plain that Conrad's Approved AGR must be adjusted in light of his expected increase in revenue, but that the adjustment must be done pursuant to the procedures outlined in the Handbook. This is so regardless of Conrad's expectations. *See Quadrant Corp.*, 110 P.3d at 737 ("[T]he expectations of the insured cannot override the plain language of the contract.").

## CONCLUSION

[6] When all the provisions are read as a whole, the district court's interpretation provides the only reasonable interpretation of the Policy: Conrad was entitled to an adjustment of his five-year average and Rain & Hail was obligated to "apply the claim adjustment and other procedures established or approved by FCIC." That is exactly what happened. The judgment of the district court is

**AFFIRMED**.