**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| RANCHO DE CALISTOGA, a California General Partnership, | No. 12-17749 |
| Petitioner - Appellant, | D.C. No. 3:11-cv-05015-JSW |
| v. | OPINION |
| CITY OF CALISTOGA; W. SCOTT SNOWDEN, Hearing Officer, The City of Calistoga, | |
| Respondents - Appellees. | |

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted February 13, 2015
San Francisco, California

Before: McKEOWN, W. FLETCHER, and CLIFTON, Circuit Judges.

Opinion by Judge McKEOWN, Circuit Judge:

Fifth Amendment takings challenges to mobile home rent control laws are

ubiquitous in this and other circuits. Quoting Yogi Berra, we have previously

1

characterized these claims as "deja vu all over again." *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1122 (9th Cir. 2013). Each time a court closes one legal avenue to mobile home park owners seeking to escape rent control regimes, the owners, undaunted, attempt to forge a new path via another novel legal theory. This time, it is in the form of an "as-applied private takings claim" as a claim separate and independent from the owner's regulatory takings claim. Alas, it is also deja vu again with respect to the result; we decline to open the door to using this so-called "private takings claim" as an end-run around established regulatory-takings jurisprudence. We hold that no regulatory taking occurred here and that Rancho de Calistoga's self-styled "private takings claim" is not a separately cognizable claim. Similarly, we are not persuaded by the related due process and equal protection claims. We affirm the district court's dismissal of the case.

## BACKGROUND

Rancho de Calistoga ("the Park") is a mobile home park located in Calistoga, California. The Park, which encompasses 26.5 acres, was originally developed by Hal C. Aguirre and R. C. Roberts. When the Roberts and Aguirre partnership dissolved in the mid-1970's, one of the parcels was transferred to

2

Aguirre, who formed Rancho de Calistoga ("Rancho"), the California general partnership that now owns and operates the Park of the same name. Rancho describes the Park as having been developed as "an alternative form of housing for those who desired and could afford that alternative form of housing," and not as "low cost or low income housing." Zoning for the Park was approved in October 1970.

The City of Calistoga ("the City") had no form of mobile home rent control until 1984, when the City adopted an ordinance that enabled mobile home park tenants to challenge rent increases. The ordinance was amended several times, and in 2007, the City adopted Ordinance No. 644, entitled "Mobile Home Park Rent Stabilization." Calistoga, Cal., Municipal Code ch. 2.22 (2007) ("Ordinance 644"). The purpose of the ordinance is to "stabilize mobile home park space rents" to, among other things, "[p]revent exploitation of the shortage of vacant mobile home park spaces," "[p]revent excessive and unreasonable . . . rent increases," and "[r]ectify the disparity of bargaining power" between park owners and mobile home owners. *Id.* § 2.22.010.D.

The City based the ordinance in part on the findings that: (1) "[r]esidents of mobile home parks, unlike apartment tenants or residents of other rental properties,

3

are in a unique position in that they have made a substantial investment in a residence for which space is rented or leased"; (2) "relocation of a mobile home from a park space is generally accomplished at substantial cost" and comes with risk of damaging the home; and (3) rent increases could "cause a hardship to a substantial number" of mobile home park residents, "most of whom are elderly, on fixed incomes, or persons of low income." *Id.* § 2.22.010.B. The City also found it "necessary to protect mobile home homeowners . . . from unreasonable rent increases and at the same time recognize the rights of mobile home park owners to maintain their property and to receive just and reasonable return on their investments." *Id.* § 2.22.010.B.4.

The ordinance authorizes a yearly rent increase equal to the lesser of 100% of the percent change in the Consumer Price Index or 6% of the base rent. *Id.* § 2.22.070.A. It also establishes an administrative mechanism for park owners to seek to increase rent above this amount. *Id.* § 2.22.080. This process exists to "insur[e] mobile home park owners a fair, just, and reasonable rate of return on their parks in cases where the annual space rent increase provided by [the ordinance] proves insufficient." *Id.* § 2.22.010.D.5.

4

In September 2010, Rancho asked the City Council to establish a public subsidy program to provide mobile home park tenants with a monthly stipend equal to the difference between the market rate and the rent control rate, regardless of need. The City Council did not act on the request.

In 2010, Rancho decided to notice a rent increase from $471.39 to $625 per month, which an economist retained by Rancho deemed to be "not excessive but . . . slightly below market." An administrative hearing officer, W. Scott Snowden, conducted evidentiary hearings. In July 2011, Snowden issued a decision in which he rejected Rancho's request and instead allowed a rent increase to a total of $537.59 per space per month. Snowden declined to rule on Rancho's constitutional claims, noting that "it would be premature to consider an 'as-applied' constitutional challenge to the ordinance as such an inquiry would be best left to the courts."

Following the ruling, Rancho filed a Petition for Writ of Administrative Mandamus in the Napa County Superior Court. That same day, it filed suit in federal court against the City of Calistoga and Snowden (collectively referred to as "The City"), asserting claims for, among other things, violations of the Takings, Due Process, and Equal Protection Clauses of the United States Constitution. It

5

also filed with the district court a notice regarding the pendency of the state petition. The City successfully moved to dismiss. The district court found that any facial challenge to Ordinance 644 was time barred, that Rancho failed to state claims for private takings, due process, and equal protection violations, and that the regulatory takings claim was not ripe. The court granted Rancho leave to amend its as-applied claims.

Rancho then filed a First Amended Petition that included the same due process and equal protection claims and a revised private takings claim. Rancho did not challenge the court's conclusions with respect to the facial challenges or regulatory taking claim, but reserved "any right it may have to seek reconsideration and/or appellate review of any" of the court's rulings. The district court granted a second motion to dismiss and entered judgment for the City. The court again found that Rancho failed to state a private takings claim, and that the due process and equal protection claims were "subsumed by the purported takings claim."

In the related state litigation, the California Court of Appeal affirmed the trial court's denial of Rancho's petition in July 2015. *Rancho de Calistoga v. City of Calistoga*, No. A138301, 2015 WL 4099027 (Cal. Ct. App. July 7, 2015).

Rancho then appealed to the California Supreme Court, where the case remains pending.

ANALYSIS

## I.  TAKINGS CLAIM

The Takings Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005), provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.

The law on condemnations and physical takings, which the Supreme Court has described as "as old as the Republic," is governed by the simple rule that "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).  Thus, in physical takings cases, the analysis inevitably focuses on the public use and just compensation requirements.

In contrast to a physical taking, a regulatory taking occurs where "government regulation of private property [is] so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537.

7

Regulatory takings claims, such as the one here, are "of more recent vintage."[1]

*Tahoe-Sierra*, 535 U.S. at 322. These claims are "characterized by essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances" to determine whether a taking has occurred in the first place. *Id.* (citations and internal quotation marks omitted). The factors to be considered in this type of factual inquiry are laid out in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 124 (1978). Only after it has been determined that a taking has occurred do the issues of public use and just compensation become relevant. We therefore begin our analysis with this first step—whether a regulatory taking has occurred—and conclude that it has not.

### A.      Regulatory Takings Analysis

At the outset, we consider whether Rancho's claims are ripe. The Supreme Court has articulated "two independent prudential hurdles" that apply to federal regulatory takings claims. *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 733-34 (1997). First, there is a finality requirement—a claim "is not ripe until

---

[1] The Supreme Court laid to rest any argument that a mobile home rent control ordinance constitutes a physical taking in *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 532 (1992) (holding that such a rent control ordinance "is a regulation of petitioners' use of their property" and not "an unwanted physical occupation of [the] property") (emphasis omitted).

the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985). The hearing examiner's decision satisfies the requisite finality.

Exhaustion is the second requirement—"the owner [must have] unsuccessfully attempted to obtain just compensation through the procedures provided by the State for obtaining such compensation." *Id.* at 195. Rancho appropriately proceeded in state court to obtain just compensation, but lost at both the trial and intermediate appellate stages.[2] The California Court of Appeal's opinion includes extensive analysis, including a rejection of the takings claim under the *Penn Central* factors: "We reject Rancho's claim under the takings clause, which, like the due process clause, protects a property owner's right to earn a fair return on its investment." *Rancho de Calistoga*, 2015 WL 4099027, at *5. Rancho's petition to the California Supreme Court remains pending.

---

[2] We note that this court has determined that California's compensation procedures are constitutionally adequate. *Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1192 (9th Cir. 2008).

9

Echoing the Court's decision in *Suitum*, we previously determined that the *Williamson* ripeness requirements are prudential rather than jurisdictional, meaning that they are formulated by the court rather than stemming from Article III. *See Guggenheim v. City of Goleta*, 638 F.3d 1111, 1117 (9th Cir. 2010) (en banc). Here, Rancho sufficiently "utilized" the available judicial procedures laid out in *Williamson.* 473 U.S. at 197. As a consequence, "it would be a waste of the parties' and the courts' resources to bounce the case through more rounds of litigation." *Guggenheim*, 638 F.3d at 1117.

We now turn to the merits of the as-applied regulatory takings claim. In essence, Rancho claims that even if the taking is for a public purpose, the rent subsidy should be paid by the government if the rent is neither excessive nor the result of monopoly power. This characterization of the claim—taken directly from Rancho's brief—is just another formulation of a facial attack on the ordinance. In other words, Rancho is saying that the rent adjustment scheme is invalid on its face if it does not accommodate these principles. Of course, the district court foreclosed a facial challenge as time barred.

Even if the claim were cognizable through an as-applied attack, it fails. The Supreme Court "has consistently affirmed that States have broad power to regulate

housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Yee v. City of Escondido*, 503 U.S. 519, 528-29 (1992) (internal quotation mark omitted). "However, under *Penn Central* . . . a regulatory taking may occur—and just compensation is required—when 'regulatory actions [occur] that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner' with the inquiry 'focus[ing] directly upon the severity of the burden that government imposes upon private property rights.'" *MHC*, 714 F.3d at 1127 (quoting *Lingle*, 544 U.S. at 539) (alteration in original).

*Penn Central* "identif[ies] several factors, not a set formula," to determine whether this functional equivalence exists. *Guggenheim*, 638 F.3d at 1120. Chief among the factors to be considered are "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations" and "the character of the governmental action—for instance whether it amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good." *Lingle*, 544 U.S. at

11

538-39 (citing *Penn Cent.*, 438 U.S. at 124) (internal quotation marks omitted) (alteration in original).  Applied here, these factors counsel in favor of the City.

The economic impact factor favors the City because Supreme Court cases "have long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust for S. California*, 508 U.S. 602, 645 (1993) (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (approximately 75% diminution in value); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5% diminution)); *see also MHC*, 714 F.3d at 1127-28 (81% diminution).  Rancho claims diminution in market value (from $16,580,000 to $11,850,000 under rent control, or 28.53%), as well as lost income.  This economic impact is an inevitable consequence of the rent-control scheme but not an unconstitutional one.

We pay particular attention to Rancho's distinct investment-backed expectations.  This principle "implies reasonable probability, like expecting rent to be paid, not starry eyed hope of winning the jackpot." *Guggenheim*, 638 F.3d at 1120.  Because Rancho cannot reasonably expect that its property will be

12

continually unencumbered by government regulation, this factor also favors the City.

Rancho argues that because, unlike in *Guggenheim*, 638 F.3d at 1120-21, and *MHC*, 714 F.3d at 1128, it has owned the Park since before the City imposed a rent control ordinance, it had an investment-backed expectation to be free from rent control. This temporal difference does not give Rancho a valid investment-backed expectation of owning a mobile home park unencumbered by government regulation. Simply put, when buying a piece of property, one cannot reasonably expect that property to be free of government regulation such as zoning, tax assessments, or, as here, rent control. Rancho's argument is tantamount to saying that a homeowner can reasonably expect that the tax assessment or rate of taxation on her home will not increase from the time of purchase. Just as "[t]hose who do business in [a] regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end," those who buy into a regulated field such as the mobile home park industry cannot object when regulation is later imposed. *Concrete Pipe*, 508 U.S. at 645 (alteration in original). Like the California Court of Appeal, "[w]e decline to hold that a landlord whose building or park existed before the enactment of rent control necessarily suffers a

taking when rent control is implemented." *Rancho de Calistoga*, 2015 WL 4099027, at *5.

Rancho's argument that it has an investment-backed expectation to earn a "fair return" fares no better. In fact, this argument proves the City's point. Ordinance 644 authorizes a specified yearly rent increase and establishes an administrative mechanism for park owners to seek to increase rent above this amount. Ordinance 644 §§ 2.22.070.A, 2.22.080. Under the ordinance, "[a] park owner may seek an adjustment to the initial base rent" so that the owner is assured of "receiving a fair and reasonable return." *Id.* § 2.22.040.B. Rancho did just that and obtained a $50 upward adjustment in 1995. *Rancho de Calistoga*, 2015 WL 4099027, at *5. Then, the Ordinance provides for automatic annual increases that Rancho in fact received. *Id.* § 2.22.070. And, finally, the ordinance permits the owner to propose an additional rent increase, as Rancho did here. *Id.* § 2.22.080.

We assume for purposes of Rancho's argument that its proposed rent increase is neither excessive (in some undefined sense) nor monopolistic. Significantly, as the California Court of Appeal observed, "Rancho's true quarrel appears to be with the whole idea of rent control, not with how [the] City

14

administered its duly enacted rent control ordinance in this case." *Rancho de Calistoga*, 2015 WL 4099027, at *5.

The City has designed a system aimed at giving park owners a fair return while still furthering the goals of rent control. Rancho may disagree with the specific rent prices authorized by the ordinance, but this disagreement does not give rise to a constitutional taking nor is a mobile home park owner entitled to unilaterally impose its own formulation of "excessive" or "monopolistic" as the standard necessary for a taking.

We last address the character of the governmental action. We have consistently given our imprimatur to the underlying public purpose of mobile home rent control ordinances and have characterized them as "much more an 'adjust[ment of] the benefits and burdens of economic life to promote the common good' than . . . a physical invasion of property." *MHC*, 714 F.3d at 1128 (quoting *Penn Cent.*, 438 U.S. at 124) (alteration in original). The same holds true of Ordinance 644 and its application to Rancho. Accordingly, there has been no regulatory taking.

B.    **Self-Styled "Private Takings Claim"**

Perhaps seeing the writing on the wall with respect to its regulatory takings claim, Rancho devotes the majority of its briefing to what it presents as a separate "private takings claim," arguing that the application of Ordinance 644 to rent increases constitutes an unconstitutional private taking because any purported "public use" is pretextual. Two years ago, in *MHC*, we noted that we were "aware of no court that has ever recognized a regulatory private taking," but because we concluded that the claim failed on the merits, we "assume[d] without deciding that such a claim is possible." 714 F.3d at 1129 n.5. Today we pick up where *MHC* left off, holding that under the circumstances here, Rancho's so-called "private takings claim" cannot serve as an independent means to challenge an alleged regulatory taking. Rather, such a public-use challenge must function as part of the larger regulatory takings claim. As explained below, viewed in this context, Rancho's claim fails for multiple reasons.

Putting the "private as-applied takings" moniker on Rancho's claim is both confusing and misleading. A short history of the terminology is in order. True private takings—those effected by non-governmental actors—such as the power granted to the railroads to take private lands to expand the rails "have a long and distinguished pedigree in our legal system." Abraham Bell, *Private Takings*, 76 U.

16

CHI. L. REV. 517, 585 (2009). Another variation, as Bell notes, is the "government-mediated private taking[]" in which the government "simply acts as a middleman who transfers the property from one set of private hands to another." *Id.* at 520. And finally, when used as the basis of a takings claim such as Rancho's, "the term 'private takings' more narrowly refer[s] to public takings motivated by a 'private purpose.'" *Id.* at 519 n.6.

This third approach, as Rancho is attempting to use it here, is simply a renaming of the regulatory takings claim, which seeks to determine whether a property regulation is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. Of course, the Constitution requires that the government's taking must be for a public use.

Tellingly, in making its private takings argument, Rancho relies predominantly on condemnation cases, running afoul of the Supreme Court's teaching that the "longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,'

17

and vice versa." *Tahoe-Sierra*, 535 U.S. at 323 (footnote omitted). Accordingly, as a general matter, "we do not apply our precedent from the physical takings context to regulatory takings claims." *Id.* at 323-24.

Yet Rancho's private takings argument is rooted in the Supreme Court's statement in the condemnation case *Kelo* that the state may not "take property under the mere pretext of a public purpose, when its actual purpose [is] to bestow a private benefit." *Kelo v. City of New London*, 545 U.S. 469, 478 (2005). The crux of Rancho's argument is that because none of the purposes enumerated in Ordinance 644 apply here, its application is pretextual. According to Rancho, the real purpose behind the application of Ordinance 644 here is to "provide each and every one of the 184 tenants with a significant monthly subsidy, whether they need it or not." This "subsidy," Rancho argues, violates the principle "that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*." *Kelo*, 545 U.S. at 477. This argument fails because it is simply a reframing of a facial challenge to the ordinance through an attack on the stated purposes of the rent-control scheme. Other related arguments fail for the same reason. As noted before, the district court dismissed the facial challenge as time barred and Rancho did not appeal this issue. Rancho cannot resuscitate this claim

18

by re-labeling it and claiming to challenge "the real purpose" of the ordinance through an "as-applied" attack on the validity of the ordinance.

Rancho offers up a number of additional arguments. To the extent those arguments seek to challenge the public purpose of the ordinance as applied, they merge the cart and the horse. Because we determined that there has been no taking in the first place, it is unnecessary to address whether the public use requirement is met.

Rancho raises two final, though unrelated, points. In 2010 Rancho proposed legislation to the City Council requiring the City to provide rent subsidies to mobile home park tenants "without regard to need, equal to the difference between the rent control rate and the fair market rate." The rent control administrator apparently said the proposal was "unreasonable." This statement, however, proves nothing. As Rancho acknowledges, it had no right to have the proposal adopted; indeed, no claim is made that the Council acted improperly. Rancho's theory that the reaction of the administrator is evidence of "as-applied" pretext is pure speculation and is not tethered to the City's enforcement of the actual ordinance.

Finally, Rancho claims that the rent subsidy violates the California Constitution's prohibition against gifts of public funds, while at the same time

admitting that the City has not made an illegal gift. Cal. Const. art. XVI, § 6 ("The Legislature shall have no power . . . to make any gift or authorize the making of any gift, of any public money or thing of value to any individual . . . ."). This concession is not surprising as the City has not made a transfer or gift of any "public money" to any mobile home park tenant, nor can it be said that the ordinance amounts to an indirect gift as urged by Rancho.

In sum, Rancho's self-styled "private takings claim" cannot serve as a means to evade *Penn Central* scrutiny. And in any event, as articulated here, such claim fails because it is a thinly veiled facial challenge, which is both time barred and lacks merit.

## II.    DUE PROCESS AND EQUAL PROTECTION CLAIMS

Rancho's due process and equal protection claims rest on the same grounds—that Snowden's rejection of its application was arbitrary.

Here, Rancho's theory of its due process claim—that "it is not possible to exploit a tenant unless and until the rent is above market"—relates to conduct squarely covered by the Takings Clause. Such an overlapping theory dooms the substantive due process claim. *See Colony Cove Properties, LLC v. City Of Carson*, 640 F.3d 948, 960 (9th Cir. 2011) (holding that a due process claim was

"subsumed by the Takings Clause" where a plaintiff sought a rental rate increase that would give it a fair return on its investment). Although *Lingle* left open the possibility of an independent claim where "a [property] regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause," 544 U.S. at 542, we later clarified that "the Fifth Amendment . . . preclude[s] a due process challenge . . . if the alleged conduct is actually covered by the Takings Clause." *Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 855 (9th Cir. 2007). Here, the alleged conduct is covered by the Takings Clause.

We evaluate Rancho's "equal protection challenge . . . under rational basis review because mobile [] home park owners are not a suspect class." *Equity Lifestyle Properties, Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1195 (9th Cir. 2008). Accordingly, "[u]nder rational-basis review, where a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation." *Id.*

Here, as in *Equity Lifestyle*, the ordinance articulates just such distinguishing characteristics, including the potential hardship posed by rent increases and the fact

21

that mobile home park residents "are in a unique position in that they have made a substantial investment in a residence for which space is rented or leased" and the associated relocation costs. *See* Ordinance 644 § 2.22.010.B; *Guggenheim*, 638 F.3d at 1123 (noting that this court is "bound by precedent establishing that such laws do have a rational basis"). Rancho offers no legitimate claim that Snowden's decision was politically motivated or otherwise arbitrary. We therefore affirm the district court's dismissal of Rancho's due process and equal protection claims.

## CONCLUSION

We affirm the district court's dismissal of Rancho's claims, albeit on slightly different grounds.

**AFFIRMED.**

COUNSEL LISTING

Anthony C. Rodriguez (argued), Law Office of Anthony C. Rodriguez, Oakland, California, for Petitioner-Appellant.

Amy E. Hoyt (argued), Burke, Williams & Sorenson, Oakland, California; Michelle Marchetta Kenyon, City Attorney, Calistoga, California, for Respondents-Appellees.

Michael John von Loewenfeldt, Kerr & Wagstaffe LLP, San Francisco, California, for Amicus Curiae League of California Cities.

R. S. Radford, Pacific Legal Foundation, Sacramento, California, for Amicus Curiae Pacific Legal Foundation.

Robert H. Thomas and Bethany C.K. Ace, Damon Key Leong Kupchak Hastert, Honolulu, Hawaii, for Amicus Curiae Western Manufactured Housing Communities Association.