**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LYNDSEY BALLINGER; SHARON
BALLINGER,
                    *Plaintiffs-Appellants*,

v.

CITY OF OAKLAND,
                    *Defendant-Appellee.*

No. 19-16550

D.C. No.
4:18-cv-07186-
HSG

OPINION

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted October 22, 2020
Submission Withdrawn July 16, 2021
Resubmitted January 25, 2022
San Francisco, California

Filed February 1, 2022

Before:  Richard R. Clifton, N. Randy Smith, and
Ryan D. Nelson, Circuit Judges.

Opinion by Judge R. Nelson

**SUMMARY**[*]

**Civil Rights**

The panel affirmed the district court's dismissal of an action brought pursuant to 42 U.S.C. § 1983 challenging the City of Oakland's Uniform Residential Tenant Relocation Ordinance, which requires landlords re-taking occupancy of their homes upon the expiration of a lease to pay tenants a relocation payment.

Plaintiffs alleged that the relocation fee is an unconstitutional physical taking of their money for a private rather than public purpose and without just compensation. Alternatively, they claimed that the fee constitutes an unconstitutional exaction of their Oakland home, and an unconstitutional seizure of their money under the Fourth and Fourteenth Amendments.

The panel held that although in certain circumstances money can be the subject of a physical, also called a per se taking, the relocation fee required by the Ordinance was a regulation of the landlord-tenant relationship, not an unconstitutional taking of a specific and identifiable property interest. The panel further stated that because there was no taking, it did not need to address whether the relocation fee was required for a public purpose or what just compensation would be.

The panel rejected plaintiffs' assertion that the City placed an unconstitutional condition, called an exaction, on

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

their preferred use of their Oakland home. The panel held that because the relocation fee here was not a compensable taking, it did not constitute an exaction.

The panel affirmed the dismissal of plaintiffs' seizure claim. The panel held that plaintiffs had not established a cognizable theory of state action; the City did not participate in the monetary exchange between plaintiffs and their tenants.

## COUNSEL

J. David Breemer (argued), Meriem Lee Hubbard, and Daniel M. Ortner, Pacific Legal Foundation, Sacramento, California, for Plaintiffs-Appellants.

Kevin P. McLaughlin (argued), Deputy City Attorney; David A. Pereda, Special Counsel; Maria Bee, Chief Assistant City Attorney; Barbara J. Parker, City Attorney; Office of the City Attorney, Oakland, California; for Defendant-Appellee.

Brendan Darrow and Matthew Siegel, Berkeley, California, for Amici Curiae League of California Cities and California State Association of Counties.

Nathaniel P. Bualat, Pilar Stillwater, and Rebecca Suarez, Crowell & Moring LLP, San Francisco, California, for Amicus Curiae Western Center on Law and Poverty.

**OPINION**

R. NELSON, Circuit Judge:

The City of Oakland required the Ballingers to pay their tenants over $6,000 before the Ballingers could move back into their own home upon the expiration of the lease. The Ballingers challenge the payment as an unconstitutional physical taking under the Takings Clause. Instead, the requirement to pay tenants a relocation fee before an owner may move back into their home is more properly classified as a wealth-transfer provision but not an unconstitutional taking. We therefore affirm the dismissal of the Ballingers' physical takings, exaction, and seizure claims.

I

In September 2016, Lyndsey and Sharon Ballinger leased their Oakland home for one year while fulfilling military assignments on the east coast. After one year, the lease converted to a month-to-month tenancy.

Under the City of Oakland ("the City") Municipal Code, even after a lease has ended and converted to a month-to-month tenancy, the tenancy may only end if the landlord has good cause. Oakland, Cal. Mun. Code § 8.22.360(A). Ending the tenancy, or "evicting," for good cause, includes when a landlord chooses to move back into her home at the end of the month. *Id.* § 8.22.360(A)(8)–(9). In January 2018, the City adopted the Uniform Residential Tenant Relocation Ordinance ("the Ordinance"), which requires landlords re-taking occupancy of their homes upon the expiration of a lease to pay tenants a relocation payment based on rental size, average moving costs, the duration of the tenants' occupancy, and whether the tenants earn a low income, are elderly or disabled, or have minor children. *See*

*id.* § 8.22.820. Half the payment is due upon the tenant's receipt of the notice to vacate and the other half upon actual vacation. *Id.* § 8.22.850(D)(1). And the payment need not be spent on relocation costs. Failing in bad faith to make the payments allows a tenant to bring an action against the landlord for injunctive relief, the relocation payment, attorneys' fees, and treble damages. *Id.* § 8.22.870(A).

When the Ballingers were reassigned to the Bay area, they decided to move back into their Oakland home. The Ballingers gave their tenants sixty days' notice to vacate the property, paying half the relocation payment up front and the remainder after the tenants vacated. In total, the Ballingers paid their tenants $6,582.40 in relocation fees.

The Ballingers sued the City, bringing facial and as-applied constitutional challenges under the Declaratory Judgment Act and 42 U.S.C. § 1983. Characterizing the relocation payment as a "ransom" of their home, they claimed that the relocation fee is an unconstitutional physical taking of their money for a private purpose and without just compensation. Alternatively, they claimed that the fee constitutes an unconstitutional exaction of their Oakland home, and an unconstitutional seizure of their money under the Fourth and Fourteenth Amendments.

The district court dismissed each claim under Federal Rule of Civil Procedure 12(b)(6). It held that "no precedent supports the Ballingers' argument that legislation requiring the payment of money constitutes a physical taking." Because "[t]he Ordinance . . . was generally applicable legislation," the district court concluded that it did not give rise to an actionable exaction claim, and the Ballingers had

not shown the requisite state action for their seizure claim. The Ballingers appealed.[1]

## II

We review a dismissal under Federal Rule of Civil Procedure 12(b)(6) de novo, accepting as true all allegations of material facts. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1100 n.1, 1102 (9th Cir. 2008). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Id.* at 1104.

## III

We affirm the district court's dismissal of the Ballingers' taking claim. The Ballingers assert that the Ordinance effected an unconstitutional physical taking of their money for a private rather than public purpose and without just compensation. But we disagree—even though money can be the subject of a physical, also called a per se, taking, the relocation fee required by the Ordinance was a regulation of the landlord-tenant relationship, not an unconstitutional taking of a specific and identifiable property interest. Because there was no taking, we need not address whether the relocation fee is required for a public purpose or what just compensation would be. *See Rancho de Calistoga v.*

---

[1] The City argues that because the Ballingers neglected to include a statement of the issues presented in their opening brief on appeal, we should dismiss their appeal for failure to comply with Federal Rule of Appellate Procedure 28(a)(5). *See Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 485 (9th Cir. 2010). The Ballingers should have done so, but we see no reason to dismiss this appeal when the Ballingers' opening brief otherwise makes the issues presented very clear.

*City of Calistoga*, 800 F.3d 1083, 1093 (9th Cir. 2015) (private takings claim is not an independent cognizable claim).

A

The Takings Clause of the Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const., amend. V; *see also Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 238–39 (1897) (incorporating the Takings Clause through the Fourteenth Amendment). "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021). "[A]ppropriation means *taking* as one's own." *Id*. at 2077 (citation and quotation marks omitted). "Government action that physically appropriates property is no less a physical taking because it arises from . . . a regulation (or statute, or ordinance, or miscellaneous decree)." *Id.* at 2072. The "essential question . . . is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Id*. We assess physical appropriations "using a simple, *per se* rule: The government must pay for what it takes." *Id.* at 2071.

The Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto v. Teleprompter Manhattan*

*CATV Corp.*, 458 U.S. 419, 440 (1982).[2]  For example, "the government may place ceilings on the rents the landowner can charge, or require the landowner to accept tenants he does not like, without automatically having to pay compensation." *Yee v. City of Escondido*, 503 U.S. 519, 529 (1992) (citations omitted).  "Ordinary rent control often transfers wealth from landlords to tenants by reducing the landlords' income and the tenants' monthly payments," and "[t]raditional zoning regulations can transfer wealth from those whose activities are prohibited to their neighbors." *Id.* The "transfer [of wealth] in itself does not convert regulation into physical invasion." *Id.* at 530 (challenge to mobile home rent control should be analyzed as regulatory taking); *see also Com. Builders of N. Cal. v. City of Sacramento*, 941 F.2d 872, 875 (9th Cir. 1991) (every fee provision cannot be a compensable taking).  So legislative enactments "regulating the economic relations of landlord and tenants are not *per se* takings." *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987).

Here, the Ordinance imposes a transaction cost to terminate a lease agreement.  We see little difference between lawful regulations, like rent control, and the

---

[2] In the past, this court has analyzed regulations of the landlord-tenant relationship as a regulatory taking rather than a physical taking. *See, e.g.*, *Rancho de Calistoga*, 800 F.3d at 1089 n.1 ("The Supreme Court laid to rest any argument that a mobile home rent control ordinance constitutes a physical taking . . . ."); *MHC Fin. LP v. City of San Rafael*, 714 F.3d 1118, 1126–27 (9th Cir. 2013); *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc).  Those challenges failed. But here, the Ballingers "rely solely on physical takings law," and expressly forego a regulatory takings claim.  We therefore do not address the principles of regulatory takings.  *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323–24 (2002) (courts may not apply principles of physical takings claims to regulatory takings claims).

Ordinance's regulation of the landlord-tenant relationship here.  Thus, the relocation fee is not an unconstitutional physical taking—it "merely regulate[s] [the Ballingers'] *use* of their land by regulating the relationship between landlord and tenant."  *Yee*, 503 U.S. at 528.[3]

The Ballingers argue that a taking "does not become a lesser intrusion simply because it is related to a commercial transaction" and the "decision to leave the rental market." *See Horne v. Dep't of Agric.*, 576 U.S. 350, 365 (2015) (raisin growers' decision to be raisin farmers made federal government's confiscation of raisins no less a taking); *Loretto*, 458 U.S. at 439 n.17 ("[A] landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation.").  But "[w]hen a person voluntarily surrenders liberty or property," like when the Ballingers chose to rent their property causing them to pay the relocation fee when they caused the tenants to relocate, "the State has not *deprived* the person of a constitutionally protected interest." *L.L. Nelson Enters., Inc. v. County of St. Louis*, 673 F.3d 799, 806 (8th Cir. 2012) (citing *Zinermon v. Burch*, 494 U.S. 113, 117 n.3 (1990)); *see Yee*, 503 U.S. at 527; *Fla. Power*, 480 U.S. at 252.

Here, the Ballingers voluntarily chose to lease their property and to "evict" under the Ordinance—conduct that required them to pay the relocation fee, which they would

---

[3] Further, "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation" of his property.  *Yee*, 503 U.S. at 527; *see also Fla. Power*, 480 U.S. at 252 ("This element of required acquiescence is at the heart of the concept of occupation.").  The Ballingers never asserted that there was a physical occupation of their property.  To the contrary, they invited their tenants to lease their property and paid the relocation fee.  *See Yee*, 503 U.S. at 532 (citing *Fla. Power*, 480 U.S. at 252–53).

not be compelled to pay if they continued to rent their property. *See Yee*, 503 U.S. at 527. "A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id.* at 528. Here, the Ordinance "is a regulation of [the Ballingers'] *use* of their property, and thus does not amount to a *per se* taking." *Id.* at 532.

### B

Based on the U.S. Supreme Court's "long-settled view that property the government could constitutionally demand through its taxing power can also be taken by eminent domain," *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 616 (2013), the relocation fee's obligation to pay money rather than real or personal property does not mean that it cannot be an unconstitutional taking. Even though money is generally considered fungible, *see United States v. Sperry Corp.*, 493 U.S. 52, 62 n.9 (1989), money may still be subject to a per se taking if it is a specific, identifiable pool of money, *see Phillips v. Wash. Legal Found.*, 524 U.S. 156, 169–70 (1998). Indeed, the Supreme Court has held multiple times that money can be subject to a taking, and these cases show why the relocation fee here is not one: The Ordinance "merely impose[s] an obligation on a party to pay money on the happening of a contingency," which happens to be related to a real property interest, but does not "seize a sum of money from a specific fund." *McCarthy v. City of Cleveland*, 626 F.3d 280, 284 (6th Cir. 2010) (citing *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 223–24 (2003)).

1

To begin with, the district court concluded that *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) "is the law," so "the obligation to pay money is not a taking." Because a majority of justices in *Eastern Enterprises* failed to agree to the same rationale, we reject that anything more than the *Eastern Enterprises* holding is binding in this court.

In *Eastern Enterprises*, the plaintiff challenged a statute that retroactively imposed obligations to pay for retired miners' medical expenses, claiming that this payment obligation was an unconstitutional taking of its money and a violation of substantive due process. 524 U.S. at 514–15, 517. In sum, a four-Justice plurality held that the payment obligation was a regulatory taking. *Id.* at 529 (O'Connor, J., joined by Rehnquist, C.J., Scalia, and Thomas, JJ.). But five Justices, split between Justice Kennedy's concurrence and a four-Justice dissent, conveyed that the Takings Clause is implicated only by laws that appropriate specified and identified property interests. *See id.* at 540 (Kennedy, J., concurring in the judgment and dissenting in part); *id*. at 555 (Breyer, J., joined by Stevens, Souter, and Ginsburg, JJ., dissenting).

In his concurrence, Justice Kennedy rejected the regulatory takings claim because there was no "specific property right or interest . . . at stake" and the statute did "not appropriate, transfer, or encumber an estate in land (*e.g.*, a lien on a particular piece of property), a valuable interest in an intangible (*e.g.*, intellectual property), or even a bank account or accrued interest." *Id.* at 540–41 (Kennedy, J., concurring). Instead, the payment obligation "simply impose[d] an obligation to perform an act, the payment of benefits," and was "indifferent as to how the regulated entity elects to comply or the property it uses to do so." *Id.* at 540.

But he concluded the statute violated substantive due process and thus concurred only in the plurality's holding.  Justice Breyer, writing for the four Justices in dissent, agreed that the Takings Clause is limited to claims based on "the operation of a specific, separately identifiable fund of money," or "a specific interest in physical or intellectual property . . . [but not] an ordinary liability to pay money." *Id.* at 554–55 (Breyer, J., dissenting).

So five Justices agreed that mere obligations to pay money could not constitute a regulatory taking unless connected to a "specific property right," but four of them dissented from the Court's holding.  Dissenting opinions cannot be considered when determining the holding of a fractured Supreme Court decision—only the opinions of those who concurred in the judgments can be considered. *Marks v. United States*, 430 U.S. 188, 193 (1977).

Even then, only an opinion that "can reasonably be described as a logical subset of the other" is binding. *United States v. Davis*, 825 F.3d 1014, 1021–22 (9th Cir. 2016) (en banc).  But neither the plurality nor Justice Kennedy's concurrence are a logical subset of the other since they differed on why the statute was unconstitutional. *Compare E. Enters.*, 524 U.S. at 522–38 (O'Connor, J., plurality) (unconstitutional regulatory taking), *with id.* at 539–47 (Kennedy, J., concurring) (substantive due process violation).  Thus, "only the specific result" of *Eastern Enterprises*, that the statute at issue was unconstitutional, is binding in this court. *Davis*, 825 F.3d at 1022.[4]

---

[4] Our prior applications of *Eastern Enterprises* either accord with this conclusion, were reversed by the Supreme Court, or did not reach the issue. *See Chevron U.S.A., Inc. v. Bronster*, 363 F.3d 846, 852 (9th

## 2

That said, as the district court noted, "all circuits that have addressed the issue" of the precedential value of *Eastern Enterprises* "have uniformly found that a taking does not occur when the statute in question imposes a monetary assessment that does not affect a specific interest in property." *McCarthy*, 626 F.3d at 285 (collecting cases). Indeed, *Koontz* appeared to endorse that "the relinquishment of funds linked to a specific, identifiable property interest" invoked a per se takings analysis. 570 U.S. at 614. We hold, as other circuits have, that in certain circumstances not argued here, money can be the subject of a taking. But here, the City's Ordinance imposes a general obligation to pay money and does not identify any specific fund of money; therefore, it does not effectuate an unconstitutional physical taking.**5**

---

Cir. 2004) (suggesting *Eastern Enterprises* is "of no precedential value outside the specific facts of that case" (citing *Ass'n of Bituminous Contractors v. Apfel*, 156 F.3d 1246, 1254–55 (D.C. Cir. 1998))), *rev'd on other grounds sub nom.*, *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005); *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 854 (9th Cir. 2001) (en banc) (relying on *Eastern Enterprises* plurality to hold that money may only constitute a regulatory taking), *aff'd*, *Brown*, 538 U.S. at 235 (but agreeing with dissenters in part); *Quarty v. United States*, 170 F.3d 961, 969 (9th Cir. 1999) (assuming without deciding *Eastern Enterprises* plurality was binding and finding no taking had occurred).

**5** "[P]hysical takings jurisprudence is 'as old as the Republic.'" *Cedar Point Nursery*, 141 S. Ct. at 2071 (citation omitted). Because the lack of records of discussion on the meaning of the Takings Clause, the statements of its author, James Madison, "thus provide unusually significant evidence about what the clause was originally understood to mean." William M. Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 791 (1995);

By way of example, money can be subject to a taking when the government procures the interest earned on lawyers' trust accounts, *see Brown*, 538 U.S. at 235; *Phillips*, 524 U.S. at 160; procures the interest accrued in interpleader funds, *see Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155, 162 (1980); seizes ownership of liens, which are the right to receive money secured by a particular piece of property, *see Armstrong v. United States*, 364 U.S. 40, 48 (1960); demands that one pay a debt owed to a third party to the state itself, *see Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 245 (1796) (opinion of Chase, J.); *Cities Serv. Co v. McGrath*, 342 U.S. 330, 335 (1952); or seizes money without a court order, *see Cedar Point*, 141 S. Ct. at 2076 ("We have recognized that the government can commit a physical taking . . . by simply 'enter[ing] into physical possession of property without authority of a court order.'"); *see also* Richard A. Epstein & Eduardo M. Peñalver, *The Fifth Amendment Takings Clause*, Nat'l Const. Ctr., https://constitutioncenter.org/interactive-constitution/interpretation/amendment-v/clauses/634 ("bag full of cash" is subject to physical taking).

---

Akhil Reed Amar, *The Bill of Rights* 78 (1998). Generally, Madison thought a federal constitution would best protect property interests and other rights. *See* The Federalist No. 10 (James Madison). One year after the ratification of the Bill of Rights, Madison wrote that the same sense of property includes "land, or merchandi[s]e, or money." James Madison, *Property*, Papers 14:266–68 (Mar. 29, 1792), *reprinted in The Founders' Constitution*, ch. 16, *available at* https://press-pubs.uchicago.edu/founders/documents/v1ch16s23.html. "Government," he wrote, "is instituted to protect property of every sort." *Id.* "If there be a government then which prides itself in maintaining the inviolability of property; which provides that none shall be taken *directly* even for public use without indemnification to the owner, and yet . . . violates their actual possessions, in the labor that acquires their daily subsistence, . . . such a government is not a pattern for the United States." *Id.*

The money in all those cases was taken from known persons in the form of a specific, identified property interest to which those persons were already entitled. *See Swisher Int'l v. Schafer*, 550 F.3d 1046, 1055 n.6 (11th Cir. 2008).

In contrast, the obligation to pay money in the tax and government services user fee context is not generally compensable under the Fifth Amendment because taxes and user fees are collected in exchange for government benefits to the payor. *See Sperry Corp.*, 493 U.S. at 62 n.9 ("artificial" to treat an award deduction from Iran-United States Claims Tribunal as a physical taking because "[u]nlike real or personal property, money is fungible"); *Brushaber v. Union Pac. R. Co.*, 240 U.S. 1, 24–25 (taxes could constitute a taking if "the act complained of was so arbitrary as to constrain to the conclusion that it was not the exertion of taxation, but a confiscation of property"); *see also Koontz*, 570 U.S. at 615 (collecting cases distinguishing taxes and user fees from money that can be taken). Thus, when it comes to takings, "[t]he Constitution . . . is concerned with means as well as ends." *Horne*, 576 U.S. at 362; *see also Dickman v. Comm'r of Internal Rev.*, 465 U.S. 330, 336 (1984) ("We have little difficulty accepting the theory that the use of valuable property—in this case money—is itself a legally protectible property interest.").

Here, the Ballingers' rely on *Koontz* to argue that the relocation fee is an unconstitutional taking. But *Koontz* cuts against them. The exaction in *Koontz* operated on "the direct link between the government's demand and a specific parcel of real property," 570 U.S. at 614. The Ballingers claim that a direct link exists between the government's demand for their money and their real property. We cannot deny that the relocation fee here is linked to real property, but no more so

than property and estate taxes. Rather than a mere obligation to pay in relation to the use of one's property, the government in *Koontz* demanded and specifically identified that it wanted Koontz's payment of money in exchange for granting a benefit to either Koontz's parcel of land or another identified parcel of land. *Id.* at 613 ("[U]nlike *Eastern Enterprises*, the monetary obligation burdened petitioner's ownership of a specific parcel of land."). So the demand for payment in *Koontz* was "functionally equivalent to other types of land use exactions" and amounted to a taking of an interest in the real property itself. *Id.* at 612–13 ("In that sense, this case bears resemblance to our cases holding that the government must pay just compensation when it takes a lien—a right to receive money that is secured by a particular piece of property.").

Instead, the relocation fee required by the Ordinance is a monetary obligation triggered by a property owner's actions with respect to the use of their property, not a burden on the property owner's interest in the property. It is more akin to the obligations to pay money that other circuits have held were not takings, such as

- costs to clean up hazardous waste under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 190 (2d Cir. 2003);

- survivor's benefits required from previous employers of coal miners who died from Black Lung Disease, *W.V. CWP Fund v. Stacy*, 671 F.3d 378, 387 (4th Cir. 2011);

- fines for traffic offenses caught on municipal traffic cameras, *McCarthy*, 626 F.3d at 286;

- quarterly monetary assessments based on tobacco manufacturers' market share under the Fair and Equitable Tobacco Reform Act, *Swisher Int'l*, 550 F.3d at 1057; and

- special monetary assessments on domestic utilities that benefit from facilities that process environmentally contaminated uranium, *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1340 (Fed. Cir. 2001) (en banc) ("Requiring money to be spent is not a taking of property." (citation omitted)).

Unlike the cases that have found a taking of funds a violation of the Takings Clause, this Ordinance neither identifies the Ballingers' $6,582.40 as a parcel of money it intends to take, nor seeks to seize any escrow accounts or funds that meet certain criteria. Thus, the Ballingers' physical-taking claim was not "an appropriate vehicle to challenge the power of [a legislature] to impose a mere monetary obligation without regard to an identifiable property interest." *McCarthy*, 626 F.3d at 286 (quoting *Swisher Int'l*, 550 F.3d at 1057) (alteration in original).[6]

## IV

For the same reasons, we disagree with the Ballingers that the City placed an unconstitutional condition, called an exaction, on their preferred use of their Oakland home. Though the Takings Clause prohibits the government from "deny[ing] a benefit to a person because he exercises a

---

[6] Because we hold that the relocation fee is not a taking, we need not address the Ballingers' arguments that the relocation fee is taking for a private, rather than public, purpose and without just compensation.

constitutional right" or "coercing people into giving [those rights] up" by imposing unconstitutional conditions on the use of private land, the "predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." *Koontz*, 570 U.S. at 604, 612 (citation omitted). Because the relocation fee here was not a taking, it cannot have been an unconstitutional exaction.

## A

The unconstitutional conditions doctrine of the Takings Clause allows the government to condition the use of one's property on agreeing to an exaction, or the dedication of one's other property to the public use, "so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal." *Id.* at 605–06 (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994), and *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987)). In evaluating the constitutionality of an exaction, we must balance (1) the vulnerability of "land-use permit applicants" who can be strongarmed by government entities with "broad discretion" with (2) legitimate government interests in "landowners internaliz[ing] the negative externalities of their conduct." *Id.* at 604–05.

The Supreme Court has limited the scope of exaction claims to the administrative-conditions context. *E.g.*, *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702 (1999) ("[W]e have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions—*land-use decisions conditioning approval of development on the dedication of property to public use*." (emphasis added)); *Lingle*, 544 U.S. at 546 (describing

*Nollan* and *Dolan* as "Fifth Amendment takings challenges to adjudicative land-use exactions"); *Koontz*, 570 U.S. at 604, 614 (describing *Nollan* and *Dolan* as "involv[ing] a special application" of the unconstitutional conditions doctrine "when owners apply for land-use permits," where "central concern" is "the risk that the government may use its substantial power and discretion in land-use permitting" (citation omitted)). Following the Supreme Court's lead, we have applied an exactions analysis only to generally applicable administrative, not legislative, action. *See, e.g.*, *McClung v. City of Sumner*, 548 F.3d 1219, 1227 (9th Cir. 2008) ("In comparison to legislative land determinations, the *Nollan*/*Dolan* framework applies to adjudicative land-use exactions where the 'government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit.'" (citation omitted)); *San Remo Hotel, LP v. San Francisco City & County*, 364 F.3d 1088, 1097 (9th Cir. 2004).[7]

But the doctrine barring unconstitutional conditions is broader than the exactions context. *See Koontz*, 570 U.S. at 604 (collecting cases relating to different contexts); *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 713–14 (2010) ("The Takings Clause . . . is not addressed to the action of a specific branch or branches.

---

[7] At least one Justice highlighted his disagreement. *See, e.g.*, *Cal. Bldg. Indus. Ass'n v. City of San Jose*, 136 S. Ct. 928, 928 (2016) (Thomas J., concurring in denial of certiorari) ("I continue to doubt that the existence of a taking should turn on the type of governmental entity responsible for the taking." (quotation marks and citation omitted)); *Parking Ass'n of Ga. v. City of Atlanta*, 515 U.S. 1116, 1117–18 (1995) (Thomas, J., joined by O'Connor, J., dissenting in denial of certiorari) ("It is not clear why the existence of a taking should turn on the type of governmental entity responsible for the taking. A city council can take property just as well as a planning commission can.").

It is concerned simply with the act, and not with the governmental actor . . . .").

Last year, in a now-vacated opinion, we relied on *McClung* to reject as an exaction "a general requirement imposed through legislation, rather than an individualized requirement to grant property rights to the public imposed as a condition for approving a specific property development." *Pakdel v. City & County of San Francisco*, 952 F.3d 1157, 1162 n.4 (9th Cir. 2020) (cleaned up), *vacated* 5 F.4th 1099 (9th Cir. 2021). However, the Supreme Court invited us to "give further consideration to [this] claim in light of [its] recent decision" in *Cedar Point Nursery*. *Pakdel v. City & County of San Francisco*, 141 S. Ct. 2226, 2229 n.1 (2021).

In *Cedar Point Nursery*, the Court highlighted that "[t]he essential question is not . . . whether the government action at issue comes garbed as regulation (or statute, or ordinance, or miscellaneous decree)." 141 S. Ct. at 2072. Yet the Court still limited the exactions context to "[w]hen the government conditions the grant of a benefit such as a permit, license, or registration" on giving up a property right. *Id.* at 2079. Thus, the Supreme Court has suggested that any government action, including administrative and legislative, that conditionally grants a benefit, such as a permit, can supply the basis for an exaction claim rather than a basic takings claim. *See id*. at 2072; *see, e.g.*, *Com. Builders of N. Cal.*, 941 F.2d at 873 (applying exactions analysis to legislative ordinance imposing a fee to finance low-income housing in connection with the issuance of permits for nonresidential development).

B

Here, the Ballingers claim that the City's Ordinance (a legislatively imposed condition) is an unconstitutional

exaction. The district court rejected their exaction claim as based on a generally applicable legislative condition when a properly pled exaction claim can only arise from administrative, not legislative, conditions.

In light of *Pakdel*, 141 S. Ct. at 2229 n.1, and *Cedar Point Nursery*, 141 S. Ct. at 2072, 2079, we agree with the Ballingers that "[w]hat matters for purposes of *Nollan* and *Dolan* is not *who* imposes an exaction, but *what* the exaction does," and the fact "[t]hat the payment requirement comes from a [c]ity ordinance is irrelevant." But the Ballingers miss, under the *Nollan*/*Dolan* framework, that whatever the government action is, it must condition the grant of a benefit on an unconstitutional taking. *See Dolan*, 512 U.S. at 391–92 (exactions where government bodies "make some sort of individualized determination that the required dedication [or condition] is related both in nature and extent to the impact of the proposed development."); *McClung*, 548 F.3d at 1227 (exactions analysis applies to "determinations conditioning permit approval on the grant of property rights to the public"). Here, the Ordinance does not conditionally grant or regulate the grant of a government benefit, such as a permit, and therefore does not fall under the unconstitutional-conditions umbrella.

Lastly, even so, the "starting point to our analysis" of exactions claims is still whether the substance of the condition, such as granting an easement as in *Nollan* and *Dolan*, would be a taking independent of the conditioned benefit. *Cedar Point*, 141 S. Ct. at 2073; *Koontz*, 570 U.S. at 612; *see Nollan*, 483 U.S. at 831; *Dolan*, 512 U.S. at 384. Here, the relocation fee is not a compensable taking, so the relocation fee did not constitute an exaction. We therefore affirm the dismissal of the Ballingers' exaction claim.

V

Finally, we also affirm the dismissal of the Ballingers' seizure claim.  The Fourth Amendment applies to searches and seizures in the civil context.  *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 51 (1993); *see also Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (incorporating the Fourth Amendment through the Fourteenth Amendment). To adequately plead a seizure claim, a plaintiff must allege a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983. And to establish a deprivation of Fourth Amendment rights, the Ballingers must allege the seizure was caused by state action.  *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  The Ballingers claim their tenants were "willful participant[s] in joint activity with the State or its agents" and that the Ordinance authorizes a "meaningful interference with [the Ballingers'] possessory interest in [their] property."   The district court correctly rejected these arguments.

A private individual's actions can only be considered state action if a "sufficiently close nexus" makes private action "treat[able] as that of the [government entity] itself." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (citation omitted).   Merely "authoriz[ing]," "approv[ing,] or acquiesc[ing]" to private action—such as the "creation or modification of any legal remedy"—is not enough to show state action.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52–53 (1999) (citations omitted).  And an "[a]ction by a private party pursuant to [a] statute, without something more, [is] not sufficient to justify a characterization of that party as a 'state actor.'"  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982).

The Ballingers have not established a cognizable theory of state action.  The City did not participate in the monetary exchange between the Ballingers and their tenants.  *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164–65 (1978).  Neither did it "exercise[] coercive power" over the Ballingers' tenants or "provide[] such significant encouragement, either overt or covert, that the [tenants'] choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004.  Because the tenants were not willful participants in joint activity with the State, they cannot be fairly treated as the State itself.  *Cf. Stypmann v. City & County of San Francisco*, 557 F.2d 1338, 1341–42 (9th Cir. 1977).  Nor did the City actively encourage, endorse, or participate in any wrongful interference by the tenants with the Ballingers' money. *Cf. Presley v. City of Charlottesville*, 464 F.3d 480, 488 (4th Cir. 2006).  At most, the City was only involved in adopting an ordinance providing the terms of eviction and payment. *See Sullivan*, 526 U.S. at 53.  But enacting the Ordinance of this nature is not enough— entitling tenants to demand a relocation payment is a "kind of subtle encouragement . . . no more significant than that which inheres in [a government entity]'s creation or modification of *any* legal remedy."  *See id*. (emphasis added).  Adopting the Ballingers' expansive notion of state action would eviscerate the "essential dichotomy between public and private acts." *Id.* (citation and quotation marks omitted).  Thus, we affirm the district court's dismissal of the Ballingers' seizure claim.[8]

---

[8] We affirm dismissal of the Ballingers' facial Fourth Amendment challenge as well.  Outside the First Amendment context, a facial challenge must prove that a law is "unconstitutional in all of its applications," considering only those applications "in which [the law] actually authorizes or prohibits conduct." *City of Los Angeles v. Patel*,

**AFFIRMED.**

---

576 U.S. 409, 418 (2015) (citation omitted).  But the Ballingers' as-applied seizure claim proves the Ordinance is not "unconstitutional in all applications," dooming a facial challenge.  *See Bell v. City of Chicago*, 835 F.3d 736, 739 (7th Cir. 2016) (rejecting a facial Fourth Amendment seizure claim as "the Ordinances' actual application in [the plaintiffs'] case does not violate the Fourth Amendment" (cleaned up)); *see also Patel*, 576 U.S. at 444–45 (Alito, J., dissenting) (questioning whether facial Fourth Amendment claims are ever viable given that "reasonableness . . . is pre-eminently the sort of question which can only be decided in the concrete factual context of an individual case" (citation omitted)).